UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAPAN SHAH,<br><br>                        Plaintiff,<br><br>        -against-<br><br>ROTHSCHILD & CO. U.S. INC., and FRANKLYN ARTHUR,<br><br>                        Defendants. | Civil Action No.: 1:26-cv-5741<br><br><br>**COMPLAINT**<br><br><br>Jury Trial Demanded |

Plaintiff, Sapan Shah ("Plaintiff" or "Mr. Shah"), by and through his attorneys, FJ Law, hereby complains about Defendants, Rothschild & Co. U.S. Inc. ("Rothschild" or the "Firm"), and Franklyn Arthur ("Arthur") (together herein "Defendants") and alleges as follows:

**PRELIMINARY STATEMENT**

1.      Mr. Shah is a dedicated professional who looked forward to a long, rewarding career at Rothschild, a well-known financial advisory company. For over two years, Mr. Shah tirelessly worked and at all times excelled in his role as an analyst for the Firm.

2.      In recognition of his excellence, Mr. Shah received two promotions during his tenure at Rothschild, proving that he was a valued employee who had tremendous upward potential and career ahead of him. Sadly, however, Mr. Shah's career trajectory would be derailed soon after he, in good faith, disclosed his thyroid disability.

3.      When Mr. Shah requested an accommodation to work from home in the mornings (a courtesy other non-disabled employees enjoyed), retaliation ensued. Rothschild suddenly accused him of "lack of commitment" to the Firm because he requested brief moments to work from home due to his disability. Make no mistake, Mr. Shah still worked extremely long hours in Rothschild's New York City office daily – yet he was still stigmatized due to disclosing his

disability.

4.      Rather than easily accommodate Mr. Shah, Rothschild instead forced him to go on unpaid leave in June 2024, supposedly to avoid hypothetical future "performance issues" due to his disabilities and/or perceived disabilities.  Even worse, despite actual notice of his conditions, Rothschild intentionally failed to engage in any requisite interactive process.  Mr. Shah should have, but was never, presented with appropriate accommodations, such as protected leave under the Family and Medical Leave Act ("FMLA") or paid sick leave days.  Instead, the Firm implemented a retaliatory scheme to effectuate the wrongful termination of Mr. Shah's employment.

5.      Moreover, while Mr. Shah was on leave, the Firm constantly harassed him, which only exacerbated his condition.  Despite Mr. Shah's open communication with the Firm throughout his leave as well as the Firm having actual notice from Mr. Shah's physician that he was to remain on leave to allow his physical and mental conditions to improve, the Firm consistently interrogated Mr. Shah regarding his return-to-work date.

6.      As late as September 5, 2024, Mr. Shah notified the Firm he had requested a letter from his doctor with a return date.

7.      Yet on September 6, 2024, again without any interactive process/cooperative dialogue, Rothschild wrongfully terminated Mr. Shah's employment, despite the fact he was on protected leave.

8.      There is no explanation Rothschild will be able to offer to justify its violations of the law, and utter lack of decency.  While Mr. Shah is eager to salvage his career in the competitive finance industry, he remains unemployed.  As Rothschild knows, the Firm may have effectively, and intentionally, derailed Mr. Shah's career.

9.      As such, Plaintiff complains pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA"), the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq. ("NYCHRL"), and the New York Labor Law ("NYLL"), among other laws, as set forth below.

## JURISDICTION & VENUE

10.      The Court has jurisdiction over the subject matter of the action pursuant to 28 U.S.C. § 1331 for Plaintiff's claims arising under the laws of the United States and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under state and local laws.

11.      The Court also has jurisdiction pursuant to 28 U.S.C. § 1332 as complete diversity exists between the parties and the amount in controversy exceeds $75,000.00

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to this action, occurred in this District.

## PARTIES

13.      Plaintiff is an individual who, at all relevant times, resides and is domiciled in the state of New Jersey.  Plaintiff suffers from hypothyroidism, which requires continuing treatment and which constitutes a serious health condition.  As such, Plaintiff is an individual with a disability within the meaning of federal, state, and local civil rights laws.  Furthermore, Plaintiff worked over 1,250 hours of service during the previous twelve (12) month period.

14.      Upon information and belief, Defendant Rothschild & Co. U.S. Inc., is a Foreign Business Corporation, duly authorized to conduct business in accordance with the laws of the State of New York, with a principal executive office address of 1251 Avenue of the Americas, New York, New York 10020.

15. Upon information and belief, Defendant Franklyn Arthur is an individual who, at all relevant times, was and is a resident of the State of New York. At all relevant times, Arthur was the Vice President of Benefits & Payroll and was Plaintiff's supervisor. Arthur controlled business decisions, including, but not limited to, the compensation, hours, and other material employment terms and conditions for employees, including Plaintiff.

16. At all relevant times, Plaintiff was an "employee" and/or "covered employee" of Defendants under all relevant statutes protecting human rights in the State of New York including, but not limited to, the definitions of the term under the FMLA, NYSHRL, NYCHRL and NYLL. The harm to Plaintiff alleged herein occurred within New York City and New York State.

17. At all relevant times, Defendants were an "Employer" and "Supervisor" of Plaintiff, including, but not limited to, the definition of the term under the FMLA, NYSHRL, NYCHRL, NYLL and other applicable laws below.

18. A copy of this Complaint will be served upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York within ten days of its filing.

## MATERIAL FACTS

### Mr. Shah Was Hired and Rose Through the Ranks

19. Mr. Shah began his employment at Rothschild in or around December 2022, as an "analyst."

20. Sadly, Mr. Shah suffers from hypothyroidism, a chronic condition in which the thyroid does not produce enough hormones to allow the body to function normally. Symptoms include fatigue and related physical limitations and are typically managed with regular doctor visits, prescribed medication, and rest when necessary.

21. During his employment, Mr. Shah received treatment for his symptoms which

included taking medication every morning to regulate hormone production.  This medication had the effect of temporarily slowing down his body function.  While Mr. Shah was able to perform his duties with reasonable accommodations, in the mornings, his body physically was unable to move or otherwise engage in strenuous activity, such as commuting on mass transit, until the medication fully took effect.

22.    However, despite his physical disability, Mr. Shah performed in his role exceptionally well with reasonable accommodations.  As such, he kept his medical conditions private.  He managed his symptoms by working from home in the early mornings and late evenings.  This was a common practice in the Firm by other employees, who frequently worked from home for entire workdays.

23.    While his hours varied depending on the needs of the Firm, Mr. Shah often began answering emails and performing various other work-related tasks at around 8:00 a.m. or 9:00 a.m. He would then commute to work and arrive at the office at around 10:00 a.m.  He would remain there until 10:00 p.m., unless the day was particularly busy, in which case Mr. Shah would remain at the office until well after midnight.

24.    Again, despite his physical disability, Mr. Shah was an exceptional employee and was very dedicated to his work.  As evidence, Mr. Shah survived multiple rounds of layoffs from the Firm including those that occurred in or around Fall 2023 and early 2024.  Mr. Shah also received praise for his work including his attention to detail and effective use of Excel, amongst other things.

25.    To top it all off, Mr. Shah was also promoted by Rothschild to "Senior Analyst." This all demonstrated Mr. Shah's high levels of productivity and how his "unofficial accommodations" allowed him to excel in his role.

***Mr. Shah Formally Disclosed His Medical Condition, But Rothschild Retaliated and Refused to Accommodate Him***

26.     In or around February 2024, Mr. Shah met with his Manager, Charles Swartz ("Swartz"), and Managing Director Collin Cropper ("Cropper") for an annual review.  During this meeting, Mr. Shah bravely disclosed his struggles with hypothyroidism and the need to work from home in the early mornings.  Mr. Shah's formal request for a reasonable accommodation triggered Rothschild's affirmative duty to engage in the interactive process and cooperative dialogue.

27.     Instead, the Firm, through Swartz, short circuited its legal obligations, and instantly denied Mr. Shah's request with no further discussion.  Immediately after the review, Adam Reeder ("Reeder"), "Head of the Group," requested a meeting with Mr. Shah.  Just as he had done with Swartz and Cropper, Mr. Shah disclosed his hypothyroidism, a disability under all applicable laws, and his need to continue working from home during the morning as a reasonable accommodation. Once again, Rothschild flouted its affirmative duty to engage in the interactive process and cooperative dialogue.  Instead, Reeder arbitrarily denied Mr. Shah's request and removed his work from home privileges proclaiming that Mr. Shah needed to, "*[M]ake more of an effort. Try to take meds in the office. Try harder.*"  Such an arbitrary removal of Mr. Shah's work from home privileges constituted an immediate adverse employment action.

28.     This was the very first time anyone at the Firm spoke to Mr. Shah in such a dismissive and insensitive tone.  At the end of this meeting, Rothschild curiously rewarded Mr. Shah with his third promotion in only two years, showing nothing was deficient in his efforts or performance (and evidence this review was based on his performance prior to the disclosure of his disability and request for accommodations).

29.     However, after the disclosure of his disability to Swartz, Cropper, and Reeder, Rothschild implicitly conditioned the promotion on removing Mr. Shah's ability to work from

home in the mornings.  Thus, Mr. Shah faced the impossible task of choosing to take care of his own health or continue to advance his career.

30. Dedicated to the Firm and understanding how small the securities industry is, Mr. Shah acquiesced to Rothschild's unlawful ultimatum, despite the toll it would take on his health. Thus, in March 2024, Mr. Shah was promoted to "Associate."

### *Mr. Shah's Medical Condition Began to Deteriorate Due to the Firm's Retaliation*

31. Despite jeopardizing his health and struggling through the mornings, Mr. Shah rose to the occasion and continued to perform exceptionally well.  Evidencing his unwavering dedication to the Firm (and his career), he continued to work during familial commitments in India in April 2024.  Given the time change, Mr. Shah worked through the nights, despite his absence being "approved."  Indeed, nobody ever called his loyalty or work product into question.

32. When he returned to New York, Mr. Shah felt increasingly pressured by Rothschild's threat to stop working from home in the early morning if he wanted to remain in the Firm's good graces.  Apart from the threat, the Firm's continued unwillingness to engage in the interactive process and cooperative dialogue continued to negatively impact Mr. Shah's physical and emotional health.  Sadly, Rothschild's discriminatory acts pressured Mr. Shah to jeopardize his health and he had to delay taking his necessary thyroid medication so he could work earlier. Indeed, "[t]ry harder" never looked so cruel.

33. Unfortunately, Mr. Shah was physically unable to endure the delay in taking his medication.  The forced departure from his treatment plan and early commute continued to take an increasing toll on his well-being.

34. To make matters worse, in or around March of 2024, at least one senior analyst who worked at the Firm left, and their work was redistributed amongst those who worked in the same

department at the Firm, which included Mr. Shah.

35. As a result, Mr. Shah's workload and hours increased and he regularly stayed at the Firm until well past 1:00 a.m., and even once stayed at the Firm overnight.

36. In the event that Mr. Shah left before 11:00 p.m. he would receive disparaging comments such as, *"Are you taking a half day?"*

37. Thus, from March 2024 to June 2024, Mr. Shah only took one (1) Saturday off due to the increased workload. On both Saturdays and Sundays, Mr. Shah regularly worked eight (8) hours or more each day.

38. On Saturday, June 8, 2024, *even though the office was closed*, Mr. Shah continued his duties remotely as weekend work was expected. However, Mr. Shah was battling the physical ailments of his hypothyroidism along with the mental stress caused by the Firm's refusal to accommodate him. Understandably, Mr. Shah physically and mentally struggled with work this day as a result of the unlawful conduct by his employer.

39. On Monday, June 10, 2024, Mr. Shah received a call from his new manager, Jaclyn White ("White"), alleging a lack of productivity on the preceding Saturday. This was the very first time in his employment that the Firm brought forth allegations of purported lack of productivity against Mr. Shah, and it is clear evidence of the heightened scrutiny he faced after the disclosure of his disability. Mr. Shah explained that he had become inhibited due to the symptoms associated with his hypothyroidism, along with anxiety stemming from, among other things, Rothschild's clear disdain for his disability and continued retaliatory efforts. Again, Rothschild had an affirmative duty to engage in the interactive process and cooperative dialogue. However, yet again, the Firm ignored these obligations.

40. Rothschild could easily have had a discussion with Mr. Shah to discuss a wide

variety of reasonable accommodations.  The Firm could have offered Mr. Shah: (1) the ability to use protected sick days; (2) the ability to use his substantial accrued and unused Paid Time Off ("PTO") or vacation days; (3) the accommodation of working from home in the mornings, as he had the first two years of his employment as he could have performed his duties from home (and as allowed to other, non-disabled employees); (4) a temporary modification of his duties and responsibilities until his conditions stabilized; or (5) protected leave under FMLA, among countless other available reasonable accommodations.

41.    Instead, and driven by the Firm's unlawful animus against employees who were, or perceived to be, disabled, Rothschild continued its discrimination and harassment, and to lay the framework for the eventual wrongful termination of Mr. Shah's employment by offering one option only: *go on short-term disability leave*.

42.    Rothschild ignored its affirmative duty to engage in any interactive process or cooperative dialogue.  The Firm's failure to offer any other option – especially protected FMLA leave, which should have run concurrently – established its unlawful animus about employees who are disabled, or whom it perceived to be disabled.

43.    Mr. Shah did not want to go on leave, nor file for short-term disability leave, however, he was left with no other choice and forced to do so by the Firm in the absence of any alternatives.  Thus, Mr. Shah commenced leave on or around June 11, 2024.

### *Rothschild Frustrated Mr. Shah's Efforts to Substantiate His Leave*

44.    At all times during his leave, Mr. Shah kept in constant contact with Rothschild and Unum, the third-party benefits provider who was responsible for processing his short-term disability claim.  Yet, despite Mr. Shah's transparency and willingness to complete any and all paperwork needed to substantiate his leave and protect his job, Mr. Shah was repeatedly badgered with emails by Franklyn Arthur ("Arthur"), Rothschild's Head of Benefits & Payroll, and Kerry

Dolcimascolo ("Dolcimascolo"), the Director of Human Resources.  These individuals had one singular focus: harass Mr. Shah for taking leave without any regard for his ongoing need for accommodations, and/or the potential for additional accommodations upon his return.

45.     Mr. Shah's disclosure of his medical conditions to Arthur and/or Dolcimascolo during the time he was on the Firm's unpaid leave, again, triggered a continuing affirmative duty for Rothschild to engage in the interactive process and cooperative dialogue, yet Rothschild refused.

46.     On June 11, 2024, Arthur sent Mr. Shah short-term disability ("STD") paperwork and requested it be completed by Mr. Shah's doctor and returned by an arbitrary deadline of June 18, 2024.  Mr. Shah advised Rothschild the earliest appointment available was after this deadline. As such, Arthur unilaterally decided that Mr. Shah was being "placed on an unpaid leave, effective June 16, 2024, until we receive your completed disability claim form and Unum makes a decision on your claim."  Yet another adverse employment action.  Again, despite full knowledge that Mr. Shah was on leave for medical reasons, Rothschild failed to advise Mr. Shah of any of his protected rights and options, such as FMLA.

47.     On June 24, 2024, Mr. Shah attended an appointment with his healthcare provider. In the paperwork requested by Rothschild, the provider indicated Mr. Shah suffered from his physical disability.  The provider also noted Mr. Shah would need medical leave for at least three weeks and would need to be reevaluated to determine if he was ready to return to work.

48.     Mr. Shah promptly submitted this note along with the other required paperwork to Rothschild's agent, Unum, as instructed.  However, Arthur emailed Mr. Shah demanding he send the doctor's note to Rothschild, even though she knew Unum was already in possession of the required information.

49. On July 2, 2024, Mr. Shah complied with the Firm's retaliatory, unnecessary, and harassing request, and emailed the packet to Arthur.

50. On July 15, 2024, Arthur emailed Mr. Shah, in full:

> ***Thank you Sapan – I am able to open this attachment. Please note that based on your doctor's response on Page 10, you are due to return to work on Tuesday, July 23, 2024.***

51. Arthur intentionally misconstrued the above referenced medical note, the last of which read, Mr. Shah "may be back to work July 22, 2024*, if deemed ready*." Not only did Arthur misconstrue the return-to-work date, but she flat out ignored everything else Mr. Shah's healthcare provider wrote about his unambiguous need for a reasonable accommodation, including, "*needs adjustments with work schedule*." Again, Rothschild failed to engage in any sort of interactive process.

52. On July 19, 2024, under the subject "Return to Work," Dolcimascolo emailed Mr. Shah and copied Arthur inquiring about Mr. Shah's "plan" "to return to the office as scheduled on July 22, 2024." Not only was this inaccurate and unreasonable, but it further demonstrated Rothschild's unwillingness to allow Mr. Shah any remote work accommodations. Again, these remote work accommodations were terms and conditions available to other non-disabled employees, and available to Mr. Shah prior to disclosing his disability.

53. Mr. Shah replied on July 19, 2024, and advised of his upcoming weekly follow-up appointment, and that he would advise Rothschild on his ability to return to work promptly thereafter. Additionally, Mr. Shah renewed his request for an accounting of his vacation days, writing, "*what was the ultimate count on vacation days, I don't believe I confirmed the final version*." The purpose was to see if he could use PTO days to extend his leave as Rothschild seemed unwilling to provide reasonable accommodations or consider the diagnosis by Mr. Shah's healthcare provider. Again, this request was ignored in retaliation.

54.    On July 22, 2024, Mr. Shah had a follow-up appointment.  His doctor extended his leave: "*advised not to engage in any work-related activities to fully recover; may try go back to work August 26, 2024.*"

55.    Later during the day on July 22, 2024, Mr. Shah promptly provided this updated note by email to Arthur and Dolcimascolo.  At the end of this email, he once again asked about his vacation days: "*Additionally, what was the final count of vacation days? I don't believe I received a final update regarding that.*"  As before, this request was ignored.

56.    On August 12, 2024, Arthur emailed Mr. Shah claiming Unum had cancelled his STD claim and instead was pursuing a workers' compensation claim.  She demanded "a response" from Mr. Shah by 12:00 p.m., August 14, on how he would like to proceed.  Confused, Mr. Shah explained this was inaccurate and there must have been some miscommunication.

57.    On August 15, 2024, Arthur altered the subject of the email and instead (and despite the prior doctor's note he provided) demanded Mr. Shah provide a return-to-work date writing:

> **"[R]egardless of any claim with Unum or workers' compensation, by Wednesday, August 21 we need a note from your healthcare provider confirming when you will be able to return to work."**

58.    As before, Arthur completely ignored the contents of Mr. Shah's doctor's notes and his need for reasonable accommodations.  Instead, Rothschild tried to intimidate him with arbitrary, unreasonable and short deadlines.  Moreover, for the third time, Mr. Shah requested a count of his vacation days as all his previous inquiries had gone completely unanswered.

59.    On August 19, 2024, Mr. Shah had another follow-up appointment.  He was still improving, but not yet able to return to work.  As such, his provider indicated:

> **"Not ready to go back to work- Advised to continue therapy or CBT. May return to work in 2 months -- October 14, 2024."**

60.    Mr. Shah promptly provided the note to Rothschild.

61.     On August 21, 2024, Arthur emailed Mr. Shah, and again demanded, despite the fact Unum remained involved, that he would need to furnish a return-to-work note from his provider by August 30, 2024, directly to her, another arbitrary and unilateral deadline.

62.     Despite his apprehension regarding sharing such personal information with Arthur, as he had previously been informed by Unum to communicate directly with them, Mr. Shah, desperate to save his job under continuing harassment and retaliation, obliged and requested his doctor's office send the paperwork directly to Arthur.

63.     Accordingly, on August 28, 2024, Mr. Shah received confirmation that the paperwork had been provided to Arthur.  Unfortunately for Mr. Shah, these attempts would later prove to be fruitless.

64.     On September 5, 2024, Arthur emailed Mr. Shah and falsely claimed that she had not heard from him.  She threatened that if she did not receive a response by the next day, Mr. Shah's employment would be terminated.

65.     Again, Arthur flouted any semblance of the interactive process/cooperative dialogue.  Mr. Shah responded shortly thereafter and informed Arthur that his doctor's office had confirmed the letter was previously sent to both Arthur and Unum, and that he had requested the letter but had no other way to obtain the letter as Unum and Arthur had requested his doctor's office communicate directly with Unum.  Ignoring all of this, Arthur, in contradiction of her prior demands, Firm policy and the law, responded:

> *"Sapan—You are responsible for providing us with the note from your healthcare provider. Please send it to us as an email attachment by 5:00PM EST on Friday September 6, 2024."*

66.     Notwithstanding the continued toll such inferior terms and conditions of employment took on Mr. Shah, he promptly informed Arthur that he had contacted his doctor's

office and again requested the information but had been informed that the doctor had been on vacation and may not be able to provide the letter by the next day.

67.    In yet a further act of harassment, Arthur asked whether Mr. Shah had even contacted the healthcare provider – falsely accusing him of dishonesty, and another retaliatory effort.

68.    On September 11, 2024, again, with no interactive process or cooperative dialogue, Arthur made good on her promise and unlawfully terminated Mr. Shah's employment. In an email, she wrote:

> **While you have failed, despite our repeated requests, to provide us with a doctor's note, you have advised us that your current return to work date is November 4, but that date is not certain.**
>
> **Under the circumstances, and in light of the undue hardship caused to your department by your absence and uncertain return, your employment is terminated effective immediately.**

69.    In no uncertain terms, Mr. Shah's employment was terminated because of his actual or perceived disabilities. As this animus was plainly obvious to Mr. Shah, he sadly replied to Arthur, "*I'm sorry my medical condition has caused an undue burden on the group.*" Yet it was not his medical condition that caused an undue burden, but rather Rothschild's discriminatory animus and repeated refusal to accommodate Mr. Shah or engage in the interactive process/cooperative dialogue.

70.    At all times, Mr. Shah was able to fully perform his role, and exceptionally well. Only when Rothschild prohibited him from working from home – an accommodation allowed to others – forced him to go on leave, retaliated and harassed him while on leave, and played the role of physician, ignoring Mr. Shah's provider's recommendations, and dictating when he took necessary medication so as to be present in the office in the early morning, did Mr. Shah experience

any hardship at work.

71.     Had Rothschild engaged in an interactive process and simply tried to find an accommodation that worked, Mr. Shah never would have gone on leave, never would have applied for STD, and never would have had his employment terminated. Instead, and based on unlawful animus about the abilities of people managing physical and mental ailments, the Firm fired him, derailing a promising career in the securities industry.

72.     As a result of the acts and conduct complained herein, Mr. Shah suffered and will continue to suffer the loss of income, salary, bonuses, the loss of pension, benefits, and other compensation which such employment entails.

73.     As a result of Defendant's actions, Mr. Shah felt extremely targeted, ostracized, victimized, emotionally distressed, and physically injured.

74.     As a result of Defendant's discriminatory and intolerable treatment of Mr. Shah, he suffered, and continues to suffer, severe emotional distress and physical ailments.  Mr. Shah also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

75.     Defendant's acts were willful, malicious, wanton, and reckless, and, thus, Mr. Shah is entitled to punitive damages.

### AS A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
### <u>FMLA INTERFERENCE</u>

76.     Plaintiff repeats, reiterates and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

77.     By the actions described above, Defendants unlawfully interfered with Plaintiff's FMLA rights.  Plaintiff gave proper notice of his intent to utilize, and was entitled to utilize, FMLA protections, and Defendants thwarted, denied, and prevented Plaintiff obtaining benefits.

78.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

79.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

80.   Defendants' unlawful actions constitute reckless, intentional, malicious, willful and wanton violations of the FMLA.

### AS A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### FMLA RETALIATION

81.   Plaintiff repeats, reiterates and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

82.   By the actions described above, Defendants retaliated against Plaintiff for exercising and/or attempting to exercise his FMLA rights.  Plaintiff engaged in a protected activity by providing sufficient information to reasonably apprise Defendants that he had a serious health condition.  As a result, Defendants took materially adverse employment action against Plaintiff in retaliation.

83.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

84.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

85.    Defendants' unlawful actions constitute reckless, intentional, malicious, willful, and wanton violations of the FMLA.

## AS A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
## DISCRIMINATION IN VIOLATION OF THE NYSHRL

86.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

87.    New York State Executive Law § 296 provides:

"It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status or status as a victim of domestic violence, of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." (Emphasis added).

88.    Defendants violated the section cited herein by creating and maintaining discriminatory working conditions, failing to engage in the interactive process, failing to accommodate Plaintiff, and otherwise discriminating against Plaintiff because of his disability and/or perceived disability.

## AS A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## RETALIATION IN VIOLATION OF THE NYSHRL

89.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

90.    New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because she has opposed any practices forbidden under this article."

91.    By complaining to Defendants of harassment, discrimination, and retaliation, Plaintiff engaged in protected activities.

92.    In response to Plaintiff's complaints, Defendants subjected Plaintiff to numerous adverse employment actions, including, but not limited to, the termination of his employment.

93.    Accordingly, Defendants engaged in unlawful retaliatory practices by retaliating against Plaintiff because of his opposition to unlawful employment practices.

## AS A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## AIDING AND ABETTING DISCRIMINATION UNDER THE NYSHRL

94.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

95.    New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

96.    Defendants participated in, condoned, encouraged, and approved the conduct giving rise to the unlawful conduct alleged herein, including but not limited to, discrimination, harassment, and retaliation.

97.    Defendants violated the section cited herein as set forth.

## AS A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## DISCRIMINATION UNDER THE NYCHRL

98.    Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

99.    The New York City Administrative Code § 8-107(1) provides that:

> "it shall be an unlawful discriminatory practice: (a) for an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service or immigration or citizenship status…of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." (emphasis added).

100.    Defendants engaged in an unlawful discriminatory practice in violation of N.Y.C. Administrative Code § 8-107(1)(a) by creating a hostile work environment, subjecting Plaintiff to inferior terms, conditions, and privileges of employment, and engaging in disparate treatment against Plaintiff because of his disability and/or perceived disability.

### AS A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### RETALIATION UNDER THE NYCHRL

101.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

102.    The New York City Administrative Code § 8-107(7) provides that it shall be an unlawful discriminatory practice "for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has . . . opposed any practice forbidden under this chapter…"

103.    Defendants violated this section by retaliating against Plaintiff for his protected activities as set forth above.

## AS A EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## REFUSING TO ENGAGE IN COOPERATIVE DIALOGUE
## IN VIOLATION OF THE NYCHRL

104.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

105.    Defendants were obligated to engage in a cooperative dialogue with Plaintiff related to his need for accommodation under the New York City Human Rights Law.

106.    The aforementioned acts of Defendants constitute a violation of § 8-107(28)(a)(2) of the New York City Human Rights Law, which provides, *inter alia* that:

> It shall be an unlawful discriminatory practice for an employer, labor organization or employment agency or an employee or agent thereof to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require such an accommodation.

107.    NYCHRL § 8-107(28)(d) requires Defendants, "[u]pon reaching a final determination at the conclusion of a cooperative dialogue," to provide Plaintiff with "a written final determination identifying any accommodation granted or denied."  However, Defendants failed to provide Plaintiff with any such written determination.

108.    Defendants violated these sections by failing to engage in a cooperative dialogue, failing to provide a written final determination on Plaintiff's requests, and ultimately failing to accommodate.

## AS AN NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## AIDING AND ABETTING DISCRIMINATION UNDER THE NYCHRL

109.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

110.    New York City Administrative Code Title § 8-107(6) provides that "It shall be an

unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

111.    Defendants participated in, condoned, encouraged, and approved the conduct giving rise to the unlawful conduct alleged herein, including but not limited to, discrimination, harassment, and retaliation.

112.    Defendants violated the section cited herein as set forth.

**AS A TENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**RETALIATION IN VIOLATION OF NYLL § 215**

113.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

114.    NYLL § 215(1)(a) provides, in pertinent part:

> No employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint…that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter…or (viii) *because such employee has used any legally protected absence pursuant to federal, local, or state law*. (Emphasis added).

115.    Plaintiff utilized protected absences pursuant to the law, which is a protected activity under the law.

116.    Defendants retaliated against Plaintiff due to his protected activities which culminated in his termination.  As such, Defendants have violated this section of the NYLL.

117.    As such, Plaintiff is entitled to all appropriate relief, including but not limited to, lost compensation, back pay, front pay, liquidated damages, compensatory damages, pain and suffering, costs and attorneys' fees.

**JURY DEMAND**

118.    Plaintiff requests a jury trial on all issues to be tried.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests a judgment against Defendants as follows:

A.    Declaring that the Defendants engaged in unlawful employment practices prohibited by the FMLA, NYSHRL, NYCHRL, and NYLL, in that Defendants harassed, discriminated, and retaliated against Plaintiff on the basis of his disability and/or perceived disability.

B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    Awarding damages to the Plaintiff for any lost wages and benefits, past and future, back pay and front pay, and interest, resulting from Defendants' unlawful acts and employment practices;

D.    Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation in an amount to be determined at trial;

E.    Awarding Plaintiff all damages sustained as a direct and proximate result of Defendants' unlawful conduct alleged herein;

F.    Awarding Plaintiff civil penalties and liquidated damages;

G.    Awarding Plaintiff punitive damages;

H.    Awarding Plaintiff all interest, attorney's fees, costs, disbursements and expenses incurred in the prosecution of the action; and

I.    Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper.

Dated:  July 7, 2026
        Purchase, New York

Yours, etc.

FJ LAW

By: _____

Joseph Jeziorkowski, Esq.
Daniel Folchetti, Esq.
*Attorneys for Plaintiff*
*Sapan Shah*
2975 Westchester Avenue, Suite 418
Purchase, New York 10577
914-730-2422
joe@fjlglaw.com
dfolchetti@fjlglaw.com